# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE CRIMINAL )
COMPLAINT OF: )
                                         )
                                         )
VICTOR MANUEL CORTIJO )  Case No. 5:19-mj-1836-JG
                                         )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, **Daniel J. Zevallos**, being first duly sworn, hereby depose and state as follows:

1.    I have been employed as a Special Agent of the U.S. Army Criminal Investigative Detachment (CID) since July 19th, 2016, and am currently assigned to the Fort Bragg CID Office. While employed by the CID, I have been trained to work a variety of federal criminal investigations. I am currently tasked with investigating all types of federal crime violating the United States Code of Military Justice and U.S. Code Title 18, all which encompass a United States Army nexus, but not limited to, Fraud, specifically involving stolen United States property.

## INTRODUCTION

2.    This affidavit is submitted in support of the Criminal Complaint filed against VICTOR MANUEL CORTIJO (hereinafter **CORTIJO**), date of birth

*GJD*

XX/XX/1980. Based on the facts set forth in this affidavit and my training and experience, your affiant respectfully asserts there is probable cause to believe CORTIJO has conspired to receive stolen U.S. property with the intent to sell it in violation of 18 U.S.C. § 371.[1]

3. The statements contained in this affidavit are based in part on: (1) Information provided by Federal Bureau of Investigation (FBI) Special Agents; (2) Written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; (3) Information gathered from private companies; (4) Witness statements; and (5) My experience, training and background as a Special Agent with CID. This affidavit includes only those facts that I believe are necessary to establish probable cause and does not include all of the facts uncovered during the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

### *Cooperating Defendant*

4. In December of 2013, Fort Bragg CID received reports of missing and believed

---

[1] "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or [w]hoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted" is guilty of having violated 18 U.S.C. § 641. A violation of 18 U.S.C. 371 requires a showing that "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy."

*GJD*

to be stolen Laser printers from Fort Bragg's Ground Intelligence Support. Soon afterwards, CID received reports of missing and believed be stolen Garmin Astro 320 handheld GPS devices. These stolen items were valued at roughly $195,000.

5.   The subsequent investigation discovered a conspiracy involving multiple military members stealing military property and selling the items to an individual hereinafter referred to as "COOPERATING DEFENDANT." A January 7, 2014, search of COOPERATING DEFENDANT's residence uncovered approximately 247 items; the seized items included high-value military property, ranging from Garmin Astro 320s to improved outer tactical vests. Relevant packing materials and shipping labels were additionally located (e.g., the Dell computer boxes labeled "Fort Bragg" for the computers noted above as stolen the prior month).

6.   Without being charged, COOPERATING DEFENDANT had entered into proffer agreements with the Government in 2013, but the information provided at that time was not satisfactory to the FBI as there were concerns that COOPERATING DEFENDANT was not fully providing all information known to him.

7.   The investigation continued to discover that COOPERATING DEFENDANT had sent multiple stolen items overseas in violation of the Arms Export Control Act (e.g, a Defense Advanced GPS Receiver (DAGR), PVS14 night vision devices, a PAS13 Thermal Weapons Sight, and a PAS23 Mini Thermal Monocular). The effort to verify

*GJD*

sale, shipment, and receipt of these items overseas was time consuming and involved the Mutual Legal Assistance Treaty between the United States and the Netherlands. Ultimately, the Dutch police seized multiple stolen items unlawfully sent by COOPERATING DEFENDANT (e.g., an Image Intensifier Generation 3 MX-10130, an Image Intensifier Generation 3 MX-10160, an Image Intensifier Generation 3 MX-11769, and two (2) BAE Systems OASYS SkeetIR Micro Thermal Imaging Monoculars).

8. Co-conspirators who had stolen military property and provided it to COOPERATING DEFENDANT provided testimony to the Government additionally confirming COOPERATING DEFENDANT's knowledge of receipt of stolen U.S. military property. The total value of items recovered and attributable to COOPERATING DEFENDANT is over $1.8 million.

9. In February of 2017, COOPERATING DEFENDANT was charged in a four count Criminal Indictment in the Eastern District of North Carolina.[2] COOPERATING DEFENDANT subsequently entered into a plea agreement and in November of 2018, pled guilty to Theft of Government Property under 18 U.S.C. § 641 and to having violated the International Traffic in Arms Regulations and Arms Export Control Act under 22 U.S.C. § 2778(b)(2) and(c). COOPERATING

---

[2] COUNT 1. 18 U.S.C. § 371 – Conspiracy to Commit Offense or to Defraud U.S (violation of 18 U.S.C. §§ 641); COUNT 2. 18 U.S.C. § 641 – Theft/Possession of U.S. Property; COUNT 3. 22 CFR 120-130 – International Traffic in Arms Regulations ("ITAR,") implementing Arms Export Control Act (22 USC § 2778); COUNT 4. 21 U.S.C § 844(a) – Simple Possession of Oxycodone; COUNT 5. 21 U.S.C § 844(a) – Simple Possession of Testosterone.
*GJD*

DEFENDANT is presently awaiting sentencing.

### *CORTIJO*

10. Pursuant to his plea agreement, COOPERATING DEFENDANT has provided information to the Government and has assisted the Government in obtaining information about and communications with CORTIJO. According to COOPERATING DEFENDANT, beginning as early as October of 2014, he had purchased military property from CORTIJO. COOPERATING DEFENDANT and CORTIJO would contact each other, but usually CORTIJO would contact COOPERATING DEFENDANT when CORTIJO had stolen military property to sell. COOPERATING DEFENDANT paid CORTIJO approximately $100,000.00 for transactions involving stolen military property.

11. COOPERATING DEFENDANT met CORTIJO through Craigslist. CORTIJO was selling Peltor headsets on Craigslist. COOPERATING DEFENDANT initially purchased Peltor headsets, tents, and cots from CORTIJO, but later moved on to purchasing Oasys Thermal Devices, MUM 23 Night Vision, and Long Range Thermal Video Systems (LRTV) after CORTIJO informed COOPERATING DEFENDANT that CORTIJO could obtain such items. COOPERATING DEFENDANT and CORTIJO initially communicated on WhatsApp and later moved

*GJD*

their communications to the Signal App.[3] COOPERATING DEFENDANT purchased the following stolen military property from CORTIJO: Approximately fifty (50) Oasys Thermals; ten (10) sets of MUM night vision; five (5) PS-220s; five (5) or six (6) PEC-15s; five (5) sets of PVS-15s; and four (4) or five (5) LRTV systems.

12. COOPERATING DEFENDANT almost always paid CORTIJO in cash for the stolen military items. However, on one occasion, COOPERATING DEFENDANT deposited $10,000.00 directly into CORTIJO'S Bank of America account, XXXXXX8487, located on Morganton Road in Fayetteville, North Carolina in exchange for Oasys Thermals or MUM'S Night Vision. COOPERATING DEFENDANT thought it was likely Oasys Thermals because it was an even number payment. The transaction was arranged by CORTIJO, but the Oasys Thermals were delivered to COOPERATING DEFENDANT by CORTIJO's then spouse, in the parking lot of Cheddar's Scratch Kitchen in Fayetteville, North Carolina.

13. On another occasion, CORTIJO agreed to sell COOPERATING DEFENDANT two (2) Oasys Thermals and arranged for a yet to be identified Hispanic male[4] to deliver them to COOPERATING DEFENDANT in the parking lot of Cross Creek Mall in Fayetteville, North Carolina. The two (2) Oasys Thermals

[3] WhatsApp and Signal are popular messaging apps using the internet with end-to-end encrypted instant messaging that can be used on various platforms used by smartphones.

[4] The unidentified Hispanic male was described by COOPERATING DEFENDANT to be in his mid to late 30s, athletic build, approximately six feet tall, wore an Army Uniform, had a strong Hispanic accent, and drove a black Mazda 6 like vehicle.
*GJD*

were delivered to COOPERATING DEFENDANT in tan cases by the unidentified Hispanic male who was wearing an Army uniform.

14. During a previous transaction, CORTIJO provided COOPERATING DEFENDANT two (2) UTC devices. The UTC devices were not able to be turned on and COOPERATING DEFENDANT agreed to send them to a third party who would then send them to BAE for repair. Once the two UTC devices were repaired, COOPERATING DEFENDANT would sell them and pay CORTIJO $3500.00 per UTC device, for a total of $7,000.00. COOPERATING DEFENDANT sent off the two (2) UTC devices for repair, but has not received them back.

15. On August 2, 2018, through messages captured on the Signal App, COOPERATING DEFENDANT informed CORTIJO that the guy doing the repairs on the UTC devices had come through. COOPERATING DEFENDANT went on to inform CORTIJO that a guy was asking for a couple "TVs", referring to LRTVs.

16. On August 23, 2018, in a consensually recorded phone call , COOPERATING DEFENDANT and CORTIJO referred to the repair guy having CORTIJO's two UTC devices for over one year. COOPERATING DEFENDANT asked CORTIJO if CORTIJO's guys could get any more items, referring to Oasys Thermals or LRTVs. CORTIJO informed COOPERATING DEFENDANT that CORTIJO's guys were nervous and would not do anything right now. CORTIJO told COOPERATING DEFENDANT that CORTIJO had a guy in Florida that could get rid of the stuff,

*GJD*

referring to the two (2) UTC devices.

17. On January 22, 2019, in a consensually recorded phone call, COOPERATING DEFENDANT and CORTIJO discussed the fact that COOPERATING DEFENDANT owed CORTIJO for the two (2) UTC devices. CORTIJO stated, "I know for a fact it was seven," referring to $7,000.00. COOPERATING DEFENDANT asked, "What's the seven, oh the two UTCs?" CORTIJO replied, "Yeah, the two UTCs and whatever else it was, I really don't care whatever else it was, it's whatever…" CORTIJO stated his messages about the two (2) UTCs had been deleted from his phone. CORTIJO noted that some people had called him about a month ago, referring to suppliers having stolen military property. CORTIJO stated that he had told them he was not dealing with it because CORTIJO did not know whether COOPERATING DEFENDANT was dealing with it anymore. COOPERATING DEFENDANT stated he really wanted to take care of what COOPERATING DEFENDANT owed him and then he wanted to move on.

18. On January 23, 2019, in a consensually monitored phone call, CORTIJO told COOPERATING DEFENDANT that CORTIJO's go-to-guy, referring to CORTIJO's supplier of stolen military property (hereinafter referred to as SUPPLIER), needed the $5,000.00 that CORTIJO owed SUPPLIER before SUPPLIER would do anything for CORTIJO. SUPPLIER had told CORTIJO that SUPPLIER was getting more stuff within the month. SUPPLIER and CORTIJO had discussed another guy that provided stuff (referring to stolen military property), but SUPPLIER told CORTIJO

*GJD*

that this second guy was no longer in the military. SUPPLIER had informed CORTIJO that SUPPLIER could have the stuff within two weeks to one month. CORTIJO stated that SUPPLIER wanted to use the $5,000.00 to get more stuff. CORTIJO did not know exactly which stolen military property SUPPLIER would acquire.

19. On January 26, 2019, CORTIJO sent a Signal App message to COOPERATING DEFENDANT to tell COOPERATING DEFENDANT that SUPPLIER was leaving Sunday night (referring to January 27, 2019) for TDY (temporary duty) and that SUPPLIER would return Friday (referring to February 1, 2019) with the items.

20. On January 26, 2019, in captured Signal App messages, CORTIJO asked COOPERATING DEFENDANT what CORTIJO was supposed to tell SUPPLIER, referring to the $5,000.00. COOPERATING DEFENDANT asked for a list of what SUPPLIER could get. CORTIJO responded with, "He needs the $ I owe him. In order to pay for the stuff not on the books. He pushed up his trip because I told him it was a sure thing." COOPERATING DEFENDANT responded, "Ok can you just try to get an idea of what might be available? I just want to assure my buyer." CORTIJO responded, "He doesn't know. But says it's most likely the usual stuff." Later that day on January 26, 2019, CORTIJO responded stating, "Minimum 6 oasis and 1 TV maybe two." COOPERATING DEFENDANT knows "TV" to be shorthand for LRTV.

*GJD*

21. On Tuesday, January 29, 2019, in captured Signal App messages between CORTIJO and COOPERATING DEFENDANT, CORTIJO stated, "Talked to guy has 6 oasis and 1 TV can get one more TV you want it." COOPERATING DEFENDANT then asked for pictures and condition. CORTIJO responded, "It's new, cant take a phone in the facility." COOPERATING DEFENDANT asked, "What do we have to pay him?" CORTIJO responded, "4k." COOPERATING DEFENDANT responded, "For everything? I want the other tv also. So we are at : 6 oasys $15k 2 TV $8k.?" CORTIJO responded, "2x TV 8k ea Yes He needs 4k before Thursday."[5] COOPERATING DEFENDANT responded, "I will have full balance when we have items in hand Still meeting Friday?" CORTIJO responded, "I'm scheduled to meet Friday, guy needs the 4k to bring the last TV before that, if not he cant."

22. On Wednesday, January 30, 2019, in captured Signal App messages between CORTIJO and COOPERATING DEFENDANT, COOPERATING DEFENDANT stated, "Hey bro I can have the 4k tomorrow. What is the latest he can receive it?" CORTIJO responded, "Let me find out." On Thursday, January 31, 2019, CORTIJO responded, "Hey bro, sorry just got word, I would need that prior to 5 pm today." COOPERATING DEFENDANT responded, "Ok Can you meet at 4 sears parking lot Starbucks side where we used to meet?" CORTIJO responded, "Ok will do."

23. On Thursday, January 31, 2019, CORTIJO was observed by Agents meeting

---

[5] Original typos maintained.
*GJD*

with COOPERATING DEFENDANT in the Sears Parking lot on the Starbucks side at Cross Creek Mall in Fayetteville, North Carolina. Agents provided COOPERATING DEFENDANT with $4,000.00 to be utilized to pay CORTIJO. In a consensually audio recorded meeting, COOPERATING DEFENDANT handed CORTIJO $4,000.00 and CORTIJO responded, "Alright, so I got four..." COOPERATING DEFENDANT stated, "and that guy is going to be able to get that other..." COOPERATING DEFENDANT responded, "...Yes..." COOPERATING DEFENDANT stated, "TV." CORTIJO then stated, "Yep." CORTIJO did not know what time CORTIJO would have the stuff tomorrow, but SUPPLIER was coming home tomorrow. COOPERATING DEFENDANT asked for pictures of the stuff and CORTIJO responded, "Yes, so he's gonna get 'em out tomorrow and I know he'll get 'em out tomorrow morning, like because he can't be right around that shit.... and what not..."

24. On Friday, February 1, 2019, in captured Signal App messages, CORTIJO informed COOPERATING DEFENDANT that SUPPLIER was arriving at RDU Airport at 11:30 P.M. (EST) that day. In subsequent Signal App messages, COOPERATING DEFENDANT and CORTIJO set up a meeting to exchange the 6 OASYS and 2 LRTVs for Saturday, February 2, 2019 at around 5:00 P.M. (EST) at the movie theater off Skibo Road in Fayetteville, North Carolina.

25. The aforementioned sale did not take place because CORTIJO claimed that the supplier was not responding to his efforts to communicate. FBI Special Agent *GJD*

Bradley Mavis later met with CORTIJO at his home residence and interviewed CORTIJO in a non-custodial setting. CORTIJO admitted that he had provided stolen military equipment to COOPERATING DEFENDANT within the past five years, but that he had concocted a story about a new supplier in order to obtain money from COOPERATING DEFENDANT owed to CORTIJO from past purchases.

## CONCLUSION

26. Based on the foregoing, your Affiant respectfully asserts that there is probable cause to believe that CORTIJO has conspired to receive stolen U.S. property with the intent to sell it in violation of 18 U.S.C. § 371. I respectfully request that this Court issue the requested Criminal Complaint and Warrant for CORTIJO.

Sworn to under the pains and penalties of perjury.

Daniel J. Zevallos
Special Agent, CID

On this __12__ day of __July__ 2019, CID Special Agent Daniel J. Zevallos appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.

JAMES E. GATES
United States Magistrate Judge